# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

|  |  |
|---|---|
| | Case No.: SACV 14-00054-CJC(JPRx) |
| TOYO TIRE & RUBBER CO. LTD and TOYO TIRE U.S.A. CORP., | |
| Plaintiffs, | ORDER GRANTING IN SUBSTANTIAL PART PLAINTIFFS' RENEWED MOTION FOR CONTEMPT |
| v. | |
| HONG KONG TRI-ACE TIRE CO., LTD., TRI-ACE WHEEL & TIRE CORPORATION, VOMA TIRE CORPORATION, ITG VOMA CORP., and DOUBLESTAR DONG FENG TYRE CO., LTD., | |
| Defendants. | |

## I.  INTRODUCTION

Before the Court is Plaintiffs' renewed motion for civil contempt.  (Dkt. 27 [hereinafter, "Mot."].)  For the following reasons, the motion is GRANTED IN SUBSTANTIAL PART.

## II.  BACKGROUND

Plaintiffs Toyo Tire & Rubber Co., Ltd., and Toyo Tire U.S.A. Corp. (collectively "Toyo") brought this case against Defendants Hong Kong Tri-Ace Wheel & Tire Corporation, Voma Tire Corporation, ITG Voma Corp., and Doublestar Dong Feng Tyre Co., Ltd. ("DDF"), on January 14, 2014, alleging seven claims for relief based on Defendants' alleged infringement of Toyo's intellectual property in its tire designs, including trade dress infringement.  (*See* Dkt. 1.)  The Complaint alleged that Defendants' Tri-Ace Mud Gripper M/T tire and Mark Ma Dakar M/T tire ("Mark Ma tire") infringed on Toyo's Open Country M/T tire ("OPMT tire") trade dress.  (*Id.* ¶¶ 73–88.)

On March 7, 2014, Toyo filed a final stipulation for judgment as to DDF ("Stipulation").  (Dkt. 8.)  The Stipulation stated that Toyo had "a protectable trade dress in the overall appearance of its" OPMT tires, noting the "tread pattern with an aggressive appearance," that "the overall tread design" was "non-functional," that Defendant DDF manufactured two "Mark Ma" tires that infringed on the OPMT trade dress due to a "confusingly similar" look, and that "[m]anufacture, importation, distribution, sale and/or offer for sale by [DDF] of tires using the OPMT Trade Dress, including [the Mark Ma tires], constitutes trade dress infringement under 15 U.S.C. § 1125(a)."  (Dkt. 8 ¶¶ 17, 19, 23–24.)  Jianhan Wang signed the Stipulation as DDF's General Manager and worked with an employee of Qingdao Doublestar Tire Industrial Co., Ltd. ("QDT") on the Stipulation.  (Dkts. 8, 10; Mot. Ex 6 Responses to Interrogatories Nos. 1 and 14.)

The Court entered a judgment in Toyo's favor on March 10, 2014 ("Final Judgment").  (Dkt. 10.)  The judgment states, "[p]ursuant to the parties' stipulation, the Court, having made no independent findings of fact or conclusions of law, orders as follows: [DDF], its subsidiaries, affiliates, parents, successors, assigns, officers, agents,

servants, employees, attorneys, and all persons acting in concert or in participation with it be preliminarily and permanently enjoined from . . . [u]sing [Toyo's OPMT] Trade Dress or any trade dress or tread or sidewall design confusingly similar thereto."  (Dkt. 10 ¶ 1.)

In prior proceedings with the International Trade Commission ("ITC") in 2013, Toyo had requested that DDF fill out a Manufacturer Settlement Questionnaire, which included a request that DDF indicate which tires it produced from a list of tires Toyo provided.  (Mot. at 4; Dkt. 27-1 [Declaration of William J. Robinson, hereinafter "Robinson Decl."] ¶ 5, Ex. 2.)  DDF indicated that it produced only the "TRI-ACE-FUEL M/T" tire.  (Robinson Decl. ¶ 5, Ex. 2 Question 9.)  One tire on the list was the AMP M/T ("AMP") tire.  (*Id.*)  Upon later investigation, Toyo discovered that the AMP tire was manufactured in China by QDT, that QDT was a sister company of DDF, and that both QDT and DDF were owned by Doublestar Group Corp ("DGC").  (Robinson Decl. ¶ 6.) Toyo claims that it did not include the AMP tire in the Stipulation because DDF actively suppressed that it produced the AMP tire in the Manufacturer Settlement Questionnaire.  (Mot. at 4, Ex. 2, Robinson Decl. ¶ 5.)[1]

The AMP tire tread pattern is virtually indistinguishable from the Mark Ma tire tread pattern –Defendants even admit the two tread patterns are "very similar."  (Mot. Ex. 1; SACV 15-00246-CJC(JPRx) [hereinafter "CIA Case"] Dkt. 352 ¶ 4.)  The raised portions of the treads are "blocks" and the grooves within the blocks are "sipes."  On the Mark Ma tire, there are four columns of blocks.  The left shoulder blocks are trapezoids

---

[1] Defendants dispute that Mr. James Dou, who communicated with Toyo's counsel regarding the Questionnaire, was acting on behalf of DDF and thus dispute whether DDF even filled out the Questionnaire.  (Opp. at 2; Woo Decl. Ex. A at 162:4-20.)  However, Defendants' admitted in their interrogatory responses in the CIA Case that QDT employees worked with Jinlin Ma to fill out the Questionnaire.  (Mot. Ex 6 Responses to Interrogatories Nos. 12 and 13.)  Defendants also accuse Toyo of having "actual or inquiry notice" that the AMP tire was produced by QDT and DDF at the time it entered into the Stipulation.  (Opp. at 2.)  Toyo's knowledge of the AMP tire does not affect the Court's ruling.

that point up diagonally towards the right.  A sipe runs horizontally through the middle of the blocks and curves downward.  The right shoulder blocks are trapezoids that point down diagonally towards the left.  A sipe runs horizontally through the middle of the block and curves upward.  In the center of the tread are two columns of blocks.  The center left blocks are trapezoids with a hook jutting outward on the bottom.  The center right blocks are trapezoids with a hook jutting outward on the top.  Both center blocks have a sipe that runs vertically down the middle of the block and curves toward the hook. The AMP tread blocks and sipes match the Mark Ma tread pattern in size, shape, and orientation.  Exhibit 1 to Toyo's motion is reproduced below to illustrate the two tire treads:



Mark Ma                    AMP

(Mot. at 3.)

On August 26, 2014, Toyo's counsel sent a letter to DDF's General Manager, Mr. Wang, and a copy was sent to QDT.  (*Id*. at 4.)  The letter summarized the Final Judgment, set out Toyo's belief that the AMP tire violated the injunction, and sought to "quickly and amicably resolve this issue."  (*Id*. Ex. 5.)  A copy of the Stipulation and Final Judgment were enclosed.  (*Id.*)  The letter was sent via FedEx, which returned a delivery receipt for Mr. Wang and QDT.  (*Id*. Ex. 7.)  Neither DDF nor QDT responded to the letter.  (Mot. at 5; Robinson Decl. ¶ 7.)  On November 13, 2014, Toyo filed a motion for contempt against DDF, QDT, and DGC.  (Dkt. 13.)  The motion was served by mail to DDF, QDT, and DGC, and included a copy of the Stipulation and Final Judgment.  (Dkts. 13, 14.)  None of the alleged contemnors responded.  (Dkts. 15, 22 at 4.)  On December 12, 2014, the Court denied Toyo's motion without prejudice.  (Dkt. 16 at 3–4.)

On February 12, 2015, Toyo filed a second lawsuit against CIA Wheel Group, DDF, QDT, and DGC, (CIA Case at Dkt. 1), seeking relief for trade dress infringement regarding the AMP tire, amongst other claims, (*id*. at Dkt. 75).  QDT and DGC were served with the complaint in September 2015, which included a copy of the Final Judgment.  (*Id*. at Dkts. 1 ¶¶ 26–30, 352 ¶ 16.)  In the course of discovery in the CIA Case, DDF and QDT both admitted to manufacturing, selling, and exporting the AMP tire, (*id*. at Dkt. 90 at ¶¶ 36–37, 91, 95), between January 2013 and August 2016, (Mot. Ex. 10, Response to Interrogatory No. 6).

Based on those findings, Toyo renewed its motion for contempt before this Court on September 26, 2016, (Dkt. 17), and the Court denied Toyo's motion without prejudice, (Dkt. 21).  On February 6, 2017, Toyo again renewed its motion for contempt, (Dkt. 22), and the Court denied Toyo's motion without prejudice, (Dkt. 26).[2]  On October 9, 2017,

---

[2] Judge Carter bifurcated the action upon CIA's motion, (CIA Case at Dkts. 220, 298), and issued a final judgment against CIA on May 30, 2017, based on the parties' stipulation (*id*. at Dkts. 337, 341).  On

Toyo filed its present renewed motion for contempt.  (Mot.)  A hearing on Toyo's motion was held on November 16, 2017, and both parties presented oral argument.

## III.  DISCUSSION

### A.  The Terms of the Final Judgment are Specific and Definite

"Rule 65(d) requires that any injunction or restraining order be 'specific in terms' and describe 'in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained.'"  *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1132 (9th Cir. 2006) (quoting Fed. R. Civ. P. 65(d)). "If an injunction does not clearly describe prohibited or required conduct, it is not enforceable by contempt."  *Gates v. Shinn,* 98 F.3d 463, 468 (9th Cir. 1996); *see also Schmidt v. Lessard,* 414 U.S. 473, 476 (1974) ("[T]he specificity provisions of Rule 65(d) are no mere technical requirements.  The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.").  "[T]he fair notice requirement of Rule 65(d) must be applied in the light of the circumstances surrounding [the order's] entry."  *Reno Air Ass'n*, 452 F.3d at 1133 (internal quotations and citations omitted).  Thus, the Court looks to the language of the Final Judgment to determine if it provided Defendants with fair and well-defined notice of the prohibited conduct.  Here, the Final Judgment provided Defendants fair notice of the conduct it enjoined.

The Final Judgment enjoined "[DDF], its subsidiaries, affiliates, parents, successors, assigns, officers, agents, servants, employees, attorneys, and all persons

---

June 1, 2017, the CIA Case was then transferred to this Court when DDF, QDT, and DGC were the only remaining Defendants.  (*Id.* at Dkt. 344.)

acting in concert or in participation with it" from "[u]sing [Toyo's OPMT] Trade Dress or any trade dress or tread or sidewall design confusingly similar thereto."  (Dkt. 10 ¶ 1.) The Final Judgment incorporated the Stipulation by reference–it was entered "[p]ursuant to the parties' stipulation."  (*Id*.)  The Ninth Circuit has "permitted incorporation by reference in certain limited scenarios, for example, where the referenced document is 'physically attached to the [order] itself.'"  *Reno Air Ass'n*, 452 F.3d at 1133.  In *Reno Air*, the Ninth Circuit held a TRO incorporated a document by reference where the TRO referred to the document and the document was attached to the TRO that was provided to the defendant when the order was served on him.  *Id*.  Here, the Final Judgment referred to the parties' Stipulation, (Dkt. 10 ¶ 1), and the Stipulation was linked to the Final Judgment on the docket entry, (*see* docket entry for Dkt. 10).  Moreover, DDF clearly had "acquired a context for understanding the referenced document and the subject matter of the dispute" because it freely entered into the Stipulation which predicated the Court's issuance of the Final Judgment.  *Reno Air Ass'n*, 452 F.3d at 1133.  QDT received the Final Judgment and Stipulation with a cease and desist letter that explained the context of the dispute.  Thus, while "incorporation by reference should be the rare exception rather than the rule," the Court finds that there could be no confusion on the part of DDF or QDT that the Stipulation was incorporated into the Final Judgment or regarding the Stipulation's contents.  *Id*.

Defendants argue that the Final Judgment is imprecise and ambiguous as to what it enjoins, and is thus unenforceable.  (Opp. at 6–9.)[3]  Defendants compare the Final Judgment to the TRO at issue in *Reno Air*.  There, the Ninth Circuit considered the terms of the injunction in its particular context–the injunction was included in a TRO that

---

[3] Defendants also argue that the Final Judgment failed to incorporate any "independent findings of fact or conclusions of law" or include any visual or descriptive aids that might provide instructive parameters of the infringing conduct to be enjoined.  (Opp. at 7–8.)  Defendants cite no case law to support the proposition that the Final Judgment had to include independent finding of facts, conclusions of law, or had to attach a visual aid to be definite.

issued the same day the action commenced and the parties had no prior litigation history. *Reno Air Ass'n*, 452 F.3d at 1133–34.  The *Reno Air* TRO enjoined the defendant from making, distributing or disposing of "items which bear the trademarks set forth in Exhibit F . . . or any confusingly similar variations thereof."  *Id*. at 1132.  The TRO did not reference trademark registrations nor did it describe the marks themselves.  *Id*. at 1133.  Exhibit F contained a copy of a t-shirt design that included various terms and images.  *Id*.  Nothing in Exhibit F identified what constituted the trademarks contained therein.  *Id*.  The Ninth Circuit noted, "Looking at this t-shirt design, one is hard pressed to know what trademarks are referenced in the order, whether the 'trademarks' invoked in the TRO referred to the t-shirt, the design as a whole, the phrase 'Reno Air Races,' all of the words depicted, the checkered pylon, one or more airplanes, the pylon plus one or more airplanes, or some other combination."  *Id*.  The Ninth Circuit also noted that the phrase "confusingly similar variations thereof" was ambiguous, particularly because "the underlying order failed to identify the trademarks with sufficient specificity."  *Id*.  "The TRO failed to meet even the most minimal fair notice requirement," thus the Ninth Circuit held the order could not serve as the foundation for a finding of civil contempt. *Id*. at 1134.

Unlike the *Reno Air* TRO, the Final Judgment meets Rule 65(d)'s fair notice requirement.  First, the injunction was issued because DDF entered into the Stipulation.  QDT became aware of the injunction because it was acting in concert with DDF to produce and sell the AMP tire.  DDF and QDT are unlike the unwitting *Reno Air* defendant who received an ambiguous TRO without any prior notice or context.  Second, the Final Judgment specified what trade dress was at issue–Toyo's OPMT trade dress.[4]

---

[4] Defendants provide no support for the argument that the Final Judgment's "disjunctive" phrasing is unenforceable.  The reasonable interpretation of the Final Judgment is that it enjoins the use of Toyo's OPMT Trade Dress *and* any trade dress *and* tread *and* sidewall design confusingly similar thereto.  If Defendants now believe the Final Judgment is not descriptive enough, they have no one to blame but themselves.  They never should have agreed to its terms by signing the Stipulation.

The Stipulation defined Toyo's OPMT trade dress as "the overall appearance of its" OPMT tires, noting the "tread pattern with an aggressive appearance." Thus, DDF and QDT were aware of "what" product was at issue, as well as "what" about the product was protected. There is no uncertainty as to the product or the protected trademark as in *Reno Air*. Moreover, the Stipulation specified that the Mark Ma tire infringed on the OPMT trade dress due to a "confusingly similar" look. The Final Judgment clearly enjoined the production and sale of the Mark Ma tire, as well as any tire that was confusingly similar to the OPMT trade dress, like the Mark Ma. DDF and QDT had notice about what was protected and what was enjoined. The Final Judgment meets Rule 65(d)'s fair notice requirement, and thus can serve as the foundation for a finding of civil contempt.

Nor is the Final Judgment's use of the phrase "confusingly similar thereto" fatal to its enforceability. Trade dress protection is generally broader than trademark protection. *See Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989) *overruled on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006) (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:1 (5th ed. 2017)). "[T]rade dress involves the total image of a product and may include features such as size, shape, color, color combinations, texture, or graphics." *Id.* (internal quotation and citation omitted); *see also Faberge, Inc. v. Saxony Products, Inc.*, 605 F.2d 426, 429 (9th Cir. 1979) (describing trade dress as the "'Gestalt' or overall visual impact of the package"). "A seller's adoption of a trade dress *confusingly similar to* a competitor's constitutes unfair competition that is actionable under section 43(a) of the Lanham Act." *Id.* (emphasis added) (citing *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 608 (7th Cir. 1986). The Final Judgment's language mirrors the law that would be applied if enjoined parties used a protected trade dress.

In *Reno Air*, the Ninth Circuit specifically held that "[b]ecause the underlying order failed to identify the trademarks with sufficient specificity, the order was hardly

enforceable as to the 'variations thereof' language." *Reno Air Ass'n*, 452 F.3d at 1132. Thus, the phrase itself was not ambiguous on its own, but was ambiguous in the context of a TRO that did not identify the "what" that "variations thereof" referred to.  Here, "confusingly similar thereto" plainly referred to Toyo's OPMT trade dress or tread pattern or sidewall designs and was not so ambiguous as to not provide Defendants fair notice of the enjoined activity.  Indeed, the Ninth Circuit approved of a similar phrase, "colorable imitations," when it affirmed a finding of contempt for violation of a consent judgment and permanent injunction that prohibited the defendant from making or selling oil lamps that are "colorable imitations" of the plaintiff company's oil lamps.  *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1321 (9th Cir. 1997); *see also Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, No. EDCV1401926JAKSPX, 2017 WL 3271706, at *35 (C.D. Cal. Aug. 1, 2017) (holding that an injunction extending to sale of "any colorable imitations" of the specified product was sufficiently definite).  The Final Judgment's use of the phrase "confusingly similar thereto" does not make it ambiguous and unenforceable.

## B.  The Final Judgment Enjoins DDF and QDT[5]

Federal Rule of Civil Procedure 65(d) provides that an order granting an injunction binds "the following who receive actual notice of it by personal service or otherwise: (A) the parties . . . and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)."  Fed. R. Civ. P. 65(d)(2).  Rule 65(d)(2),

---

[5] Toyo asserts that the Final Judgment enjoins DGC as well, but provides no evidence that DGC violated the injunction by producing the AMP tire.  (*See generally* Mot.; Dkt. 29 [Plaintiffs' Reply, hereinafter "Reply"].)  For example, in its Reply, Toyo argues that "DGC does not itself make any tires, but it actively helps DDF make them by keeping DDF's business operation going."  (Reply at 14.)  Toyo's conclusory allegations, unsupported by any evidence that DGC actually played a role in DDF's tire manufacturing, are insufficient for the Court to consider whether DGC is liable for contempt.  Toyo's citation to DGC's website, which lists DDF and QDT as its tire manufacturing bases, is insufficient to prove DGC acted in concert to produce the AMP tire *specifically*.  (Mot. at 18–19.)  As such, it is unnecessary for the Court to conclude that DGC was enjoined by the Final Judgment.

"[i]n essence," ensures that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 14 (1945). DDF's conduct should be "carefully scrutinized" and DDF should not be allowed to "simply make a tiny change and start a new trademark contest all over again . . . as to the use of the 'new' format." *Wolfard*, 118 F.3d at 1323 (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:13 (4th ed. 1996)).

The Final Judgment clearly enjoins DDF as a party. Toyo asserts that the Final Judgment also enjoins QDT under Rule 65(d) because QDT acted in concert with DDF to violate the Final Judgment having notice of its effects. (Mot. at 13–20.) The Court agrees.

### 1.   *QDT Received Notice of the Final Judgment*

"Those not identified with a party, but in active concert or participation with him, are bound only with actual notice." *N.L.R.B. v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 633 (9th Cir. 1977); *see Regal Knitwear Co.*, 324 U.S. at 14; *Chase Nat. Bank v. City of Norwalk, Ohio*, 291 U.S. 431, 435–36 (1934). QDT agrees that it received notice of the Final Judgment through service of the CIA Case in September 2015. (Dkt. 28 [Defendants' Opposition, hereinafter "Opp."] at 16.) QDT denies receiving notice before September 2015. (*Id*.) However, a FedEx delivery confirmation shows that QDT received Toyo's letter sent on August 26, 2014, which included a copy of the Final Judgment and Stipulation. QDT was also served with Toyo's first contempt motion in November 13, 2014, which included the Final Judgment.[6] In spite of QDT's present denial of receipt, unsupported by evidence, of

---

[6] Defendants' witness Mr. Wu conceded that Toyo's first contempt motion was received by QDT (CIA Case at Dkt. 350 Ex. 3 at 209:16–211:8), but Defendants now dispute that they actually received the

either the August 2014 letter or the first contempt motion, the Court finds Toyo's FedEx Confirmation and proof of service for the contempt motion compelling evidence that QDT had actual notice of the Final Judgment injunction since August 2014.

### 2.   QDT Acted in Concert with DDF

The Court also finds that QDT acted in concert with DDF in the production and sale of the AMP tire.[7]  Defendants concede QDT was involved with DDF in the manufacturing and sale of the AMP tire.  (Opp. at 16.)

## C.  Judicial Estoppel

The Court finds that judicial estoppel bars DDF and QDT from challenging the validity or protectability of Toyo's OPMT trade dress and whether the Mark Ma tire infringes on that trade dress.  "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."  *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1044 (9th Cir. 2016) (quoting *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001)).  Three factors "inform the decision whether to apply the doctrine in a particular case."  *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).  "First, a party's later position must be 'clearly inconsistent' with its earlier position."  *New Hampshire*, 532 U.S. at 750 (citation omitted).  "Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later

---

motion, (Opp. at 16 – 17; Dkt. 28-16 ¶ 4).  It is unnecessary for the Court to decide whether QDT received Toyo's first contempt motion as the Court finds QDT received Toyo's August 2014 letter.

[7] Toyo also argues that DDF bound QDT as its agent when signing the Stipulation, (Mot. at 12–15; Opp. at 14–15), and that the Defendants were in privity with each other, (Mot. at 17–20; Opp. at 17–18).  The Court need not decide these issues as it finds QDT acted in concert with DDF.

proceeding would create 'the perception that either the first or the second court was misled.'"  *Id.* (citation omitted).  "A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *Id.* at 751.

"Judicial estoppel is an equitable doctrine that is intended to protect the integrity of the judicial process by preventing a litigant from playing fast and loose with the courts."  *Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008) (internal quotation and citation omitted).  Judicial estoppel "prohibit[s] parties from deliberately changing positions according to the exigencies of the moment" and is intended to protect the judicial system rather than the litigants.  *See New Hampshire*, 532 U.S. at 749–50 (collecting cases that "have uniformly recognized that [the doctrine's] purpose is to protect the integrity of the judicial process"); *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) ("Because the doctrine is intended to protect the judicial system, *rather than the litigants*, detrimental reliance by the opponent of the party against whom the doctrine is applied is not necessary."); *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 360 (3d Cir. 1996) (noting that the majority view is that privity is not required for judicial estoppel to apply because the doctrine is intended to protect the courts rather than the litigants); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996) ("Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants"); *Kruse Tech. P'ship v. DMAX, Ltd.*, No. CV0904970JVSRNBX, 2010 WL 11519252, at *2 (C.D. Cal. Sept. 21, 2010).

Any challenge DDF raises to the validity and protectability of Toyo's OPMT trade dress or to whether the Mark Ma tire infringes on that trade dress is clearly inconsistent with the terms of the Stipulation it freely entered into.  DDF stipulated that Toyo's OPMT trade dress was valid and protectable, and that the Mark Ma tire, as well as any tire confusingly similar thereto, infringed on that trade dress.  Were the Court now to

accept DDF's argument that the OPMT trade dress was invalid, or that the Mark Ma tire did not infringe on that trade dress, it would create the perception that the Court was misled when it accepted DDF and Toyo's Stipulation and thereafter issued an unlawful injunction and Final Judgment.  DDF also would derive an unfair advantage were it able to unravel its previous Stipulation.  By entering into the Stipulation, DDF avoided the expenses of litigation and the prospect of paying a significant damages award.[8]  If DDF were now permitted to argue the OPMT trade dress is invalid and the Mark Ma tire does not infringe, it would keep that benefit while also gaining the profits of producing an infringing tire contrary to the Stipulation and Final Judgment.[9]  *See New Hampshire*, 532 U.S. at 751 (holding that "considerations of equity persuade [the court] that application of judicial estoppel is appropriate" where the plaintiff "convinced this Court to accept one interpretation of 'Middle of the River,' and having benefited from that interpretation, [the plaintiff] now urges an inconsistent interpretation to gain an additional advantage at [the defendant's] expense").  Finally, allowing DDF to challenge the validity of the OPMT trade dress would make a mockery of the Court's injunction and final judgment.  Any consent decree that enjoined an infringing party would provide no protection to the aggrieved party, as the infringer could enter into an agreement and begin violating it the very next day.[10]

---

[8] The application of judicial estoppel to bar DDF's challenge is also supported by "the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948).

[9] Defendants do not contest that judicial estoppel applies to DDF, but rather argue that that "Toyo is judicially estopped from asserting that prior definition against [DDF] because it materially changed that definition" in the CIA Case.  (Opp. at 4.)  This argument is a nonstarter.  DDF stipulated that Toyo's OPMT trade dress includes the *overall appearance* of the OPMT tire.  DDF agreed that that Toyo's OPMT trade dress was infringed by any tread confusingly similar to the OPMT tire (or Mark Ma tire).  Toyo's emphasis on the tread pattern in the CIA Case reflected the terms DDF agreed to.

[10] The Federal Circuit noted the important public policy behind giving consent decrees *res judicata* effect, much like the public policy behind the application of judicial estoppel to such decrees: "When a consent decree is to be given *res judicata* effect, litigants are encouraged to litigate the issue of validity rather than foreclosing themselves by a consent decree.  If they were given a second chance to litigate the issue of validity, alleged infringers might well accept a license under a consent decree and forego an attack on validity until favored by a stronger financial position, or until threatened by other

Judicial estoppel looks to "the connection between the litigant and the judicial system," not the "relationship between the parties to the prior litigation." *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 419 (3d Cir. 1988); *see* 18B Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 4477 (2d ed. 2002) (stating that traditional rules of mutuality may not apply "if a litigant seems to be playing the courts for fools").  "Because the doctrine of judicial estoppel is intended to protect the courts, we are particularly mindful that the '[i]dentity of parties is not a mere matter of form, but of substance.  Parties nominally the same may be, in legal effect, different; and parties nominally different may be, in legal effect, the same.'"  *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 996 (9th Cir. 2012) (citing *Chicago, Rock Island & Pac. Ry. Co. v. Schendel,* 270 U.S. 611, 620 (1926)).  "While it is true that a new party should generally not be punished for another party's 'unseemly conduct' (citation omitted), there are circumstances in which it is fair to bind a nonparty to another party's actions."  *Grochocinski v. Mayer Brown Rowe & Maw LLP*, No. 06 C 5486, 2010 WL 1407256, at *9–10 (N.D. Ill. Mar. 31, 2010), *aff'd*, 719 F.3d 785 (7th Cir. 2013), and *aff'd*, 719 F.3d 785 (7th Cir. 2013); *see Taylor v. Sturgell,* 128 S. Ct. 2161, 2172–73 (2008) (discussing the recognized categories of exceptions to the rule against nonparty preclusion).  "To protect the integrity of the judicial process, a court needs freedom to consider the equities of an entire case.  Therefore it is appropriate for a court considering judicial estoppel effects of a non-party's conduct to engage in an equitable inquiry that turns on the specific circumstances of an individual case."  *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 796–97 (7th Cir. 2013).

The unusual circumstances of this case make it equitable to treat QDT and DDF as, in substance, the same entity so that positions taken by DDF in the Stipulation would be attributed to QDT for purposes of judicial estoppel.  QDT must have known about the

---

manufacturers who were not paying royalties."  *Foster v. Hallco Mfg. Co*., 947 F.2d 469, 476–77 (Fed. Cir. 1991) (internal quotation and citation omitted).

Stipulation because DDF worked with a QDT employee, Weijie Song, on the agreement. DDF represented to Toyo, and to the Court, that the Stipulation would bind its "affiliates," including QDT.  When DDF suppressed knowledge about its production and sale of the AMP tire to Toyo in the 2013 ITC proceeding, QDT and DDF were at that time producing the AMP tire together.  Despite knowing that Toyo was interested in the AMP tire, and despite the AMP tire's almost virtually identical tread pattern to the Mark Ma tire, QDT and DDF continued to jointly produce and sell the AMP tire after the Final Judgment issued, after Toyo sent a cease-and-desist letter, after Toyo's first contempt motion was filed, and after the CIA Case was filed.  QDT's challenge to the OPMT trade dress simply takes advantage of its non-party status to the previous lawsuit in order to unravel a Final Judgment when from day one of its issuance, QDT was aware of the Final Judgment while assisting DDF to violate it.

It would be inconsistent for QDT to challenge the validity of the OPMT trade dress in this action, for the benefit of DDF, on the theory that the Final Judgment never should have issued.  This is not a merely a case where a corporation previously took a litigation position inconsistent with a position now taken by its corporate affiliate.  Rather, QDT acted in concert with DDF to produce the AMP tire in spite of the Final Judgment and in spite of Toyo's multiple attempts to enforce DDF's agreement.  Given QDT's significant involvement in DDF's violation of the Final Judgment, if QDT were to prevail in challenging the OPMT trade dress and DDF were to receive the lion's share of the recovery, the Court would be misused and misled.  "Preventing such a reality and perception is a core purpose of judicial estoppel." *Grochocinski*, 719 F.3d at 795–97 (holding that judicial estoppel applied to a nonparty who was intimately involved in the previous litigation and the "involvement created the impression that the courts were being misused").

//

**D. Contempt**[11]

A district court has the inherent authority to enforce compliance with its orders through a civil contempt proceeding, *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827–28 (1994), a wide latitude in determining whether there has been a contemptuous violation of its order, and broad equitable power to order appropriate relief, *FTC v. EDebitPay, LLC,* 695 F.3d 938, 945 (9th Cir. 2012). To establish that QDT and DDF should be held in civil contempt, Toyo must demonstrate by clear and convincing evidence that QDT and DDF violated the Final Judgment "beyond substantial compliance, and that the violation was not based on a good faith and reasonable interpretation of the judgment." *Wolfard*, 118 F.3d at 1322; *see In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993); *Ahearn ex. rel. N.L.R.B. v. International Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013).[12] If Toyo meets this initial test, the burden then shifts to QDT and DDF to demonstrate why they were unable to comply, essentially, that they "took every reasonable step to comply." *Stone v. City & Cnty. of San Francisco,* 968 F.2d 850, 856 n. 9 (9th Cir. 1992).

"In a contempt hearing, the court should not start all over again to fully analyze the new version of the mark chosen by the defendant as if it were the trial of a lawsuit against the new version." 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair

---

[11] Defendants argue that the Court must conduct a trial before ruling on contempt. (Opp. at 11–12.) This is not the law. "Because civil contempt sanctions are viewed as nonpunitive and avoidable, fewer procedural protections for such sanctions have been required." *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999) (citation omitted). "Thus civil contempt may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required." *Id.* (internal quotation and citation omitted).

[12] Toyo asks the Court to find that QDT and DDF willfully violated the Final Judgment. (Mot. at 21–22.) The absence of willfulness does not relieve a party defendant from liability for civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). "Since the purpose [of contempt] is remedial, it matters not with what intent the defendant did the prohibited act." *Id.* The Court finds it unnecessary to make a finding regarding the intent of QDT and DDF in violating the Final Judgment.

Competition § 30:18 (5th ed. 2017).  "Rather, the court must simply determine whether the terms of the injunction were violated by the new version chosen by defendant."  *Id.*; *see Wella Corp. v. Wella Graphics*, 37 F.3d 46 (2d Cir. 1994) ("The injunction … would be of questionable value if enforcement against every alteration of the infringing mark required a relitigation" of the initial determination of trademark infringement).

### 1.   Production and Sale of the AMP Tire Violated the Final Judgment

When enforcing an injunction, the Court does a simple visual comparison to assess similarity of products to determine if the defendant has kept a "fair distance" from the line of non-compliance.  *See Wolfard*, 118 F.3d at 1322–23 (holding that to enforce a trade dress consent decree that the district court "could properly determine from visual comparison" of the products that the similarity between them would probably cause consumers to mistake the defendant's lamp for the plaintiff's); *see Plough, Inc. v. Kreis Labs.*, 314 F.2d 635, 639 (9th Cir. 1963) ("[A]n infringer, once caught, should have his conduct carefully scrutinized in any future operations so as to determine his intent in going as far as he does.  He must be required to keep a safe distance away from the margin line.") (internal quotations and citation omitted).  In order to establish a violation of a consent decree, the plaintiff "need not prove a likelihood of consumer confusion in the same manner that we would require in a trademark infringement case."  *Wolfard*, 118 F.3d at 1322–23.  "Those who give up the advantages of a lawsuit in return for obligations contained in a negotiated decree, rely upon and have a right to expect a fairly literal interpretation of the bargain that was struck and approved by the court."  *AMF Inc. v. Jewett*, 711 F.2d 1096, 1101 (1st Cir. 1983) (finding a defendant in contempt of several provisions of a consent decree regarding trademarks).

DDF stipulated that the Mark Ma tire infringes on Toyo's OPMT trade dress.  The Final Judgment enjoined DDF and QDT from production and sale of any tire confusingly

similar to Toyo's OPMT trade dress, which included the Mark Ma tire.  Consequently, if the AMP tire is confusingly similar to the Mark Ma tire, it is confusingly similar to the Toyo OPMT trade dress and violates the Final Judgment.  A simple visual comparison of the Mark Ma tire and the AMP tire tread patterns reveals the two tires are virtually identical in the size, shape, and orientation of the blocks and sipes.  The tread pattern of a tire largely defines its overall appearance.  While there are some differences between the sidewalls of the Mark Ma and the AMP tire, the AMP tire is not a "safe distance" from the overall appearance of the Mark Ma.  Thus, the AMP tire is confusingly similar to Toyo's OPMT trade dress and DDF and QDT's production and sale of the AMP tire violated the Final Judgment.

Defendants make several arguments to avoid being found in contempt.  Defendants first argue that the relevant inquiry is whether the AMP tire has "confusingly similar trade dress" to the protected product– the OPMT tire–rather than the Mark Ma tire.  (Opp. at 5.)  However, the Stipulation stated that the Mark Ma tire infringed on the OPMT trade dress, and as a consequence a tire with a confusingly similar overall appearance to the Mark Ma would also infringe on the OPMT trade dress.  Relatedly, Defendants argue that the AMP tire is not confusingly similar to the OPMT tire when you look at the overall appearance of the tires and "the tread is different."  (*Id*., Dkt. 28-1 Ex. B [photographic comparisons of the AMP and OPMT tires].)  But Defendants' photographic comparisons illustrate that the AMP tire and the OPMT tire have a virtually identical tread pattern.  The size, shape, and orientation of the blocks and sipes on the AMP tire and the OPMT tire are virtually the same.  Even considering the difference in sidewall design, the AMP tire is not a "safe distance" from the OPMT tire.

Finally, Defendants argue that it is "incompatible" that Toyo defined its trade dress as the "overall appearance" of the OPMT tire, but now attempts to hold Defendants liable for a confusingly similar "subpart" of the tire.  (Opp. at 3, 5. 9.)  This argument is

nonsense.  First, Defendants ignore that DDF stipulated that Toyo's OPMT trade dress includes the *overall appearance* of the OPMT tire, with repeated emphasis on the tread pattern.  As the tread pattern of a tire largely defines the look of the tire, Toyo's emphasis on tread pattern is common sense.  Second, the Final Judgment unambiguously stated that "*any trade dress* or *tread* or sidewall design *confusingly similar*" to the OPMT trade dress infringes and violates the Final Judgment.  The parties explicitly indicated that the injunction enjoined use of any tread confusingly similar to the OPMT tire.  Toyo is simply attempting to enforce the plain and clear terms of the Stipulation that DDF freely agreed to.  It is disingenuous for Defendants now to mischaracterize and distort those terms.[13]

## 2.   *QDT and DDF Produced the AMP Tire After the Final Judgment was Entered*

Toyo has met its burden to show that QDT and DDF violated this Court's Final Judgment injunction.  Indeed, QDT and DDF admit to producing the AMP tire together in spite of DDF's Stipulation and the Final Judgment.  QDT and DDF admitted producing another 64,865 AMP tires, of which 44,772 were shipped to the United States, after the Final Judgment issued.  (Mot. Ex. 10 Response to Interrogatory No. 6.)

//

//

//

---

[13] Defendants also argue that the visual comparison standard "only applies where the alleged contemnor makes an 'insignificant change' to the previously prohibited product as a means to get around the injunction," which "is not the case here, where . . . the AMP [tire] was a separate product already in production at the time the Injunction was issued."  (Opp. at 6.)  The fact that QDT and DDF produced the AMP tire before the Final Judgment was entered does not change the fact that production of the AMP tire after the injunction went into effect violated the Final Judgment.  To hold otherwise would allow DDF and QDT to nullify the Final Judgment's effects simply because Toyo was in the dark as to who produced the AMP tire when the parties entered into the Stipulation.

### 3.    QDT and DDF Did Not Reasonably Comply with the Final Judgment

Defendants argue that they reasonably complied with the Final Judgment injunction and "in good faith [] conclud[ed] that the AMP M/T, which Toyo knew about but never mentioned in the Stipulation or Injunction, was not a prohibited tire under the terms of the Court's Injunction." (Opp. at 10–11.) "'Substantial compliance' with the court order is a defense to civil contempt, and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply." *In re Dual-Deck*, 10 F.3d at 695 (quoting *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 891 (9th Cir. 1982)). Defendants rely on their argument that the Stipulation was not integrated into the Final Judgment to argue that DDF "understood Toyo's complaints to focus solely on the Mark Ma tire," (Opp. at 10), and because DDF had produced the AMP tire since before the Final Judgment issued, it "had no reason to believe" producing the AMP tire was barred, (*id.* at 11).

"A consent decree is construed with reference to ordinary contract principles of the state in which the decree is signed." *Gates v. Gomez*, 60 F.3d 525, 530 (9th Cir. 1995) (citing *Gates v. Rowland*, 39 F.3d 1439, 1444 (9th Cir. 1994)). Under California law, "contracts are interpreted using an objective test to give effect to the mutual intention of the parties as it existed at the time the contract was made." *Gates*, 60 F.3d at 530. "The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation." *Santisas v. Goodin*, 17 Cal. 4th 599, 599 (1998); *accord Gates*, 60 F.3d at 530. Moreover, "the rule in this circuit [is] that the plaintiff should not be held to answer the infringer's subjective assertion that it cannot understand how best to comply with an injunction." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000).

The language of the Final Judgment is clear: "[DDF], its subsidiaries, affiliates, parents, successors, assigns, officers, agents, servants, employees, attorneys, and all persons acting in concert or in participation with it be preliminarily and permanently enjoined from . . . [u]sing [Toyo's OPMT] Trade Dress or any trade dress or tread or sidewall design confusingly similar thereto." The Final Judgment clearly enjoined production and sale of *any tire* that was confusingly similar to the OPMT trade dress. If Defendants understood the Final Judgment enjoined the production and sale of the Mark Ma tire, it is objectively unreasonable for Defendants to argue that production and sale of a tire with a virtually identical tire tread was not enjoined.

Defendants' actions cannot be characterized as having "made every reasonable effort to comply with the court's order." *Vertex Distrib., Inc.*, 689 F.2d at 892. Quite frankly, Defendants do not really deny that they could have complied with the injunction, but rather, only provide insight as to why they chose not to comply with the injunction.[14] "As a party under a court order that prohibited it from using the [trade dress], [Defendants] clearly had an obligation to do more than show how close [they] could come with safety to that which [they were] enjoined from doing." *AMF Inc.*, 711 F.2d at 1107. Defendant cannot "adopt[] the posture of innocence without accepting the obligations of compliance." *Id*.

//

//

---

[14] Defendants, in passing, invoke the unclean hands defense based on Toyo's statements about the AMP tire flooding the U.S. Market after the Final Judgment was entered, Toyo's "surprise" at finding DDF produced the AMP tire, and Toyo's characterization of Mr. Wu as testifying on behalf of all three Defendants. (Opp. at 12–13.) Defendants also cite to Toyo's alleged conduct in a completely different lawsuit against a different defendant in Illinois. (*Id*. at 1, 3, 13.) Toyo's conduct in the case does not rise to the level of misconduct that would support a defense of unclean hands, nor will this Court consider Toyo's conduct in unrelated litigation in a different state when determining whether Defendants violated the plain and clear terms of the Court's Final Judgment that DDF agreed to.

**E.  Toyo's Requested Sanctions**

Toyo seeks three types of sanctions: (1) lost profits in the amount of $2,986,549, or disgorgement of Defendants' profits, (2) lost profits or disgorgement trebled for lost market share and reputational injury in the amount of $8,959,647, and (3) recovery of its litigation expenses associated with both contempt proceedings in this case as well as the CIA case in the amount of $2,736,498.  (Mot. at 22–25.)  "Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both." *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986) (citing *United States v. United Mine Workers,* 330 U.S. 258, 303–04 (1947); *see also* 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:18 (5th ed. 2017). "Compensatory awards are limited to 'actual losses *sustained as a result of the contumacy*.'"  *Id.* (citing *Shuffler v. Heritage Bank,* 720 F.2d 1141, 1148 (9th Cir. 1983) (emphasis added)); *see also United Mine Workers,* 330 U.S. at 304 (compensatory fine must "be based upon evidence of complainant's actual loss"); *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 646 F.2d 800 (2d Cir. 1981) (same).  "Unlike the punitive nature of criminal sanctions, civil sanctions are wholly remedial."  *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir.1992) (citation omitted).

The district court may use the Lanham Act as a guide for imposing contempt sanctions.  *See Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1519 (11th Cir. 1990) (holding it was in the district court's discretion to use the Lanham Act as a guide to structuring a civil contempt sanction, including an award for the costs of the action).  The Lanham Act provides that a plaintiff who prevails on a trade dress infringement claim may "subject to the principles of equity ... recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. §

1117(a).[15]  However, "[a]n award of [the contemnor's] profits is not automatic upon a finding of infringement."  *Fifty-Six Hope Rd. Music*, 778 F.3d 1059, 1073 (9th Cir. 2015) (citation and internal quotation omitted).  "Rather, profits must be granted in light of equitable considerations."  *Id.*  "In seeking to achieve equity between the parties, the court must fashion a remedy wherein the defendant may 'not retain the fruits, if any, of unauthorized trademark use or continue that use [and the] plaintiff is not . . . [given] a windfall.'"  *Id.* (citing *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 918 (Fed. Cir. 1984)).[16]

In the scope of this proceeding for civil contempt, the Court must compensate Toyo for the injury it has suffered due to DDF and QDT's violation of the Final Judgment.  The Court's consideration of the appropriate sanctions does not include the full array of damages that Toyo could seek based on a finding of infringement of a trade dress under the Lanham Act.  The Court has made no finding of law that Toyo's OPMT trade dress is valid or protectable.  The Court notes that to establish a valid and protectable trade dress, the doctrinal requirements require a plaintiff to "surmount additional hurdles" compared to other forms of protected marks.  *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).[17]  One such hurdle is proving

---

[15] The Lanham Act also provides: "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  Such sum ... shall constitute compensation and not a penalty.  The court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).

[16] Defendants argue that "further argument and evidence should be permitted" as to the amount of damages to be awarded.  (Opp. at 11, 19.)  The Court requires only a reasonable estimate of damages. *Fifty-Six Hope Rd. Music*, 778 F.3d at 1076.

[17]  The Second Circuit explained:

> In any action under § 43(a), the plaintiff must prove (1) that the mark is distinctive as to the source of the good, and (2) that there is a likelihood of confusion between its good and the defendant's.  *See Wal-Mart,* 529 U.S. at 210. . . .  The product design plaintiff, however, must always make the second, more difficult showing.  *See id.* at 213–14 . . ..  Moreover, even a showing of secondary meaning is insufficient to protect product designs that are overbroad or "generic"—"those that 'refe[r] to the genus of which the particular product is a species'."  (citation omitted). . . .  A final doctrinal hurdle is the congressionally-imposed requirement that a plaintiff prove that an unregistered trade

"secondary meaning," which occurs when, "in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros.* ("*Wal-Mart*"), 529 U.S. 205, 211 (2000) (citation omitted*)*. This is difficult to prove in product design cases because "even the most unusual of product designs . . . is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* at 213.

### 1. *Toyo's Lost Profits*

In an infringement action, "[d]amages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016). "Because proof of actual damage is often difficult, a court may award damages based on defendant's profits on the theory of unjust enrichment." *Id.*; *see also Bandag, Inc.*, 750 F.2d at 918; *W. Lighting Corp. v. Smoot-Holman Co.*, 352 F.2d 1019, 1022 (9th Cir. 1965) ("In a patent infringement case, the 'actual loss' of a plaintiff resulting from sales by an infringer is not readily proved. If the defendant had not made the sale, would the plaintiff have made it? No one can really know."). "To establish damages under the lost profits method, a plaintiff must make a *prima facie* showing of reasonably forecast profits." *Id.* (citing 2 J.T. McCarthy, Trademarks and Unfair Competition § 30:27, at 511 (2d ed. 1984)). "Trademark remedies are guided by tort law principles . . . [and] [a]s a general rule, damages which

---

dress is "not functional." (citations omitted). "[A] product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." (citations omitted). And in cases involving an aesthetic feature, the dress is also functional if the right to use it exclusively "would put competitors at a significant non-reputation-related disadvantage." (internal quotation and citation omitted).

*Yurman Design*, 262 F.3d at 115–16.

result from a tort must be established with reasonable certainty." *Id.* (citation omitted). "'Damages are not rendered uncertain because they cannot be calculated with absolute exactness,' yet, a reasonable basis for computation must exist." *Id.* (citing *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379 (1927)). "Many courts have denied a monetary award in infringement cases when damages are remote and speculative." *Id.*

Toyo has not provided sufficient evidence of its lost profits resulting from QDT and DDF's contempt. Toyo requests 50% of Defendants' profits for the AMP tire since 2013, totaling $2,986,549. The record before the Court is totally inadequate to calculate what profits Toyo lost to Defendants' AMP tire sales. While Toyo provides evidence of Defendants' total AMP tire sales, Toyo's lost profit calculation is based on the "gut feeling" of its Senior Director of Marketing that 50% of AMP tire sales would have gone to Toyo. (Mot. Ex 10 186:19-188:11.) Toyo has clearly failed to meet its burden of proving reasonably certain lost profits by providing the Court an arbitrary percentage of total sales it "feels" it should be awarded. *See Lindy Pen,* 982 F.2d at 1408 (holding that the damages for lost profits set forth were speculative because plaintiff produced evidence of its total product sales, without subdividing its data into the category of sales at issue; the court also noted that "[i]t would have been error for the district court to select an arbitrary percentage of total sales to represent the more narrow submarket of telephone sales"); *Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1179 (C.D. Cal. 2017) (denying "lost profits because such damages are speculative" on trademark infringement claim).

An additional problem with Toyo's calculation is that it includes lost profits for AMP tire sales from before the Final Judgment issued. DDF and QDT cannot be held in contempt for AMP tire sales *before* they were enjoined, and the Court will not award lost profits for that time period. *See Gen. Signal Corp.*, 787 F.2d at 1380 (denying the

requested lost profits damages where there was "nothing in the record to indicate that" the plaintiff lost the stated amount "as a result of the violation of the consent order" and denying the requested attorneys' fees that were "expended in attaining the consent judgment as part of the civil contempt award" because those fees "were not caused by [the defendant's] violation of the consent judgment").

### 2. Disgorgement of QDT and DDF's Profits[18]

Toyo alternatively requests disgorgement of QDT and DDF's profits.  (Mot. at 23.) "[D]isgorgement of profits is a traditional trademark remedy and the district court's use of profits as a measure for the contempt sanction is hardly a novel proposition." *Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004 (9th Cir. 2004); *see Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 456 (1932) ("In a suit in equity against an infringer, profits are recoverable not by way of punishment but to insure full compensation to the party injured").  Indeed, the Lanham Act explicitly provides for an award of the defendant's profits when the plaintiff is found to infringe on a protected trade dress.  *See* 15 U.S.C. § 1117(a); *see also Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 6 (2d Cir. 1989), *cert. denied*, 494 U.S. 1029 (1990) ("Contempt sanctions are to be imposed once the plaintiff has proved that he has suffered harm because of a violation of the terms of an injunction, . . . but, under a theory of unjust enrichment, a contempt plaintiff is entitled to defendant's profits without submitting direct proof of injury, much less proof that any such injury approximated in amount the defendant's profits . . .  This is because an award based on the defendant's profits, resting

---

[18] Toyo seeks discretionary treble damages under 15 U.S.C. § 1117(a) based on Defendants' allegedly willful misconduct.  (Mot. at 23–24.)  Here, disgorgement of QDT and DDF's profits adequately compensates Toyo for the harm it suffered as a result of DDF and QDT's violation of the Final Judgment.  DDF and QDT ceased production of the AMP tire in 2016, so there is no potential future harm that is unlikely to be fully captured by the disgorgement of Defendants' profits.  Additionally, while Toyo claims that QDT and DDF's contempt caused it to suffer a loss of market share and reputational injury, Toyo provides no evidence to support this claim.

upon principles of unjust enrichment, focuses on the defendant's wrongdoing, not on damage to the plaintiff.") (internal quotations and citations omitted); *Howard Johnson Co.*, 892 F.2d at 1521 (awarding the plaintiff the defendant contemnor's profits on the theory of unjust enrichment); *Marshak v. Treadwell*, 595 F.3d 478, 493 (3d Cir. 2009) (holding that the trial court abused its discretion in refusing to award profits gained as a result of contempt of an injunction and that there was no need to prove actual damages if an award of profits was needed to deter infringement or defendant was unjustly enriched).

To establish the amount of the defendant's profits to be disgorged, "[t]he trademark holder has the burden to prove the defendant infringer's gross revenue from the infringement." *Fifty-Six Hope Rd. Music*, 778 F.3d at 1076 (citing *Lindy Pen*, 982 F.2d at 1408. "Then the burden shifts to the defendant infringer to prove expenses that should be deducted from the gross revenue to arrive at the defendant infringer's lost profits." *Id*. (citing *Experience Hendrix v. Hendrixlicensing.com,* 762 F.3d 829, 843 (9th Cir. 2014)). If the infringing defendant does not meet its burden of proving costs, the gross figure stands as the defendant's profits. *Russell v. Price,* 612 F.2d 1123, 1130–31 (9th Cir.1979), *cert. denied,* 446 U.S. 952, 809 (1980).

Toyo clearly suffered some injury from QDT and DDF's violation of the Final Judgment. QDT and DDF improperly profited on their AMP tire by using Toyo's OPMT trade dress in violation of the Final Judgment. Thus, it is appropriate for the Court to impose sanctions on QDT and DDF. Toyo argues that Defendants' profits from AMP tire sales in the United States has been $8,882,831 since 2013. (Mot. at 23.) Toyo's number is based on DDF's interrogatory responses in the CIA case. (Mot. Ex. 10 Response to Interrogatory No. 6.) Defendants present the costs to be deducted from the

total sales based on the same information provided in Defendants' interrogatories.  (Opp. at 18–19, Ex. M.) [19]

The Court issued the Final Judgment on March 10, 2014.  DDF was on notice that production and sales of the AMP tire were enjoined from that point onward.  Because DDF and QDT produced the AMP tire together, the fact that QDT later received actual notice of the injunction does not alter the Court's calculation of Defendants' gross profits. Every AMP tire produced after the Final Judgment issued involved DDF, thus all profits from the date of the Final Judgment entry onwards were derived in violation of the Final Judgment.

Defendants' gross sales in the U.S. from the second quarter of 2014 until production and sale of the AMP tire ceased in 2016 were $4,671,706.11.  (Mot. Ex. 10 Response to Interrogatory No. 6, Chart 1 U.S. Destination Sales from Q2 2014 until Q4 2016.)  Defendants' data on costs of production and sale includes all of its AMP tire exports internationally, not just the U.S.  (*Id*. Chart 2.)  Thus, the Court will pro-rate the costs of production and sale based on the total U.S. destination sales, as well as pro-rate the gross profits for 2014 to reflect when the Final Judgment was entered.  (*Id*. Chart 1.)

//

//

//

---

[19] Toyo objects to these interrogatory responses as inadmissible hearsay and summary charts that have been provided without the underlying source data.  (Reply at 17.)  Toyo's objections are without merit. First, Toyo introduced Defendants' interrogatory responses into evidence, (Mot. Ex. 10), and relies on these same summary charts for its calculation of disgorgement damages, (*compare to* Opp. Ex. M). "Normally, a party may not introduce his self-serving answers to an opponent's interrogatories." *Grace & Co. v. City of Los Angeles*, 278 F.2d 771, 776 (9th Cir. 1960) (citation omitted).  "However, as [Defendants'] original answer was introduced by [Toyo], [Defendants are] entitled to read any other answer which tended to explain or correct it." *Id.*  Toyo and Defendants' exhibits present identical data.

| Year | (A) Total Exports Sales [$] | (B) Total US Sales [$] | (C) Percentage of US Sales out of Total Exports Sales[20] (A/B) | (D) Overall Costs of Production and Sales [$] | (E) Costs of Production/ Sales for US Sales [$] (D*C) | (F) Net Annual Profits US Destination Sales [$] (B-E) |
|------|------|------|------|------|------|------|
| 2014 | 6,367,571.55 | 5,216,136.51 | 81.92% | 4,349,582 | 3,563,177.57 | 1,652,958.94 |
| 2015 | 772,603.27 | 86,996.45 | 11.26% | 86,816 | 9,775.48 | 77,220.97 |
| 2016 | 230,885.42 | 77,177.74 | 33.43% | 75,815 | 25,344.95 | 51,832.79 |

For 2014, 13.58% of US Destination Sales occurred in the first quarter, thus $1,428,406.83 in sales occurred after the Final Judgment issued.  In total, QDT and DDF's gross profits on the AMP tire from the date of Final Judgment entry until production and sale ceased were **$1,557,460.59**. [21]

### 3. Litigation Expenses

Toyo also requests attorneys' fees and costs for litigating both the present case and the CIA Case.  (Mot. at 25.)  Compensatory awards may, under certain circumstances, include an award to the aggrieved party of the attorneys' fees and costs in bringing the contempt proceeding.  *See Reno Air Racing Ass'n., Inc.*, 452 F.3d at 1130 n.5 (affirming the district court's award to plaintiff of reasonable attorneys' fees and costs associated with a TRO and a contempt motion); *Marshak*, 595 F.3d at 493 (affirming an award of attorneys' fees, "which the [district] court deemed justified to cover [the party's] costs in

---

[20] The percentage values are rounded up to the nearest hundredth of a percent.

[21] Defendants provide their own expert report and argue that "Toyo's alleged damages would also have to be apportioned under for the impact of its alleged trade dress on any purchasing decisions."  (Opp. at 19; Woo Decl. Ex. N.)  Based on this expert report, Defendants conclude that "at most only 5.5% of [DDF's] gross profit could be attributable to Toyo's trade dress."  (Opp. at 19; Woo Decl. Ex. N at 6.)  Defendants miss the mark.  The Final Judgment enjoined *all* production and sales of tires that were confusingly similar to the OPMT trade dress or tread or sidewall design.  Thus Defendants cannot profit from any tire produced and sold in contempt of the Final Judgment, no matter why any individual customer chose to buy an AMP tire.

securing the adjudication of contempt"); *Guess?, Inc. v. Tres Hermanos, Inc.*, No. CV 97-6336KMWCWX, 1998 WL 1770071, at *3 (C.D. Cal. June 1, 1998) (awarding attorneys' fees to bring contempt proceeding for contempt of preliminary injunction ordering defendant not to sell a product).[22]

        "[A]ttorneys' fees in a civil contempt proceeding are limited to those reasonably and necessarily incurred in the attempt to enforce compliance." *Abbott Labs. v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000); *see also Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1028 (9th Cir. 1985) (affirming award of attorneys' fees for successful contempt motions); *Robin Woods Inc. v. Woods*, 28 F.3d 396, 401 (3d Cir. 1994) (affirming the district court's conclusion that it was proper to award plaintiff compensation for management's time and expense in preparing for contempt hearing, but remanding as to the amount of damages); *Mead Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 23, 24 (5th Cir. 1968) (affirming the trial court award of out-of-pocket costs incurred in bringing proceeding for civil contempt).  Toyo may seek an award of reasonable attorneys' fees and costs reasonably and necessarily incurred in an attempt to enforce compliance with the Final Judgment and should file the appropriate motion forthwith.

//

//

//

---

[22] Some courts hold that an award of attorney fees is only proper where violation of the decree is "willful" while other courts do not impose such a condition of willfulness. 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:28 (5th ed. 2017). *Compare Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 39 (2d Cir. 1989) (requiring a finding of willful contempt in order to award attorneys' fees) *with Robin Woods, Inc.*, 28 F.3d at 400 ("[W]e reject the notion that a finding of willfulness is a prerequisite to an award of attorneys' fees against the violator of an injunction.").  Because of the compensatory rationale for sanctions based on a finding of civil contempt, the Court finds it unnecessary to determine if QDT and DDF willfully violated the Final Judgment at this time.

**V.  CONCLUSION**

For the foregoing reasons, Toyo's motion for civil contempt is GRANTED IN SUBSTANTIAL PART.  DDF and QDT are ordered to pay Toyo **$1,557,460.59** in damages.  Toyo is further directed to SUBMIT its request for attorneys' fees and costs with detailed billing records to the Court.  Toyo's motion for civil contempt as to DGC is DENIED.

DATED:      November 20, 2017

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE